UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:07CR335 JCH |
| | ) | |
| LOUGENE THOMAS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). A hearing was held on the Motion of Defendant to Suppress Evidence and Statements [Doc. #18] on September 4, 2007, and at the conclusion of the hearing, the Government stated that a request for a transcript of the proceedings would be forthcoming. Further, on October 16, 2007, the transcript was filed, and the undersigned entered a briefing schedule ordering that the Government file its post-hearing brief no later than October 26, 2007, and the Defendant any response thereto no later than November 5, 2007. Further, on November 28, 2007, Defendant filed a request for extension of time to December 7, 2007, and filed a memorandum of law on that date.

Based upon the evidence adduced at the hearing on the motion to suppress as well as the briefs of the parties and review of the transcript in this matter, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Nicholas Monasco is a police officer with the St. Louis Metropolitan Police Department, assigned to the Street Team of the South Patrol Division. On March 25, 2007, Monasco received

information from a confidential informant, who had provided him reliable information in the past, that a black male was selling narcotics from and out of Apartment 1-East, at 5500 Chippewa, in the City of St. Louis.

On March 26, 2007, in order to investigate this information, Monasco and three other officers went to the vicinity of 5500 Chippewa to determine if they could verify this information. As they drove by this address in two separate marked police vehicles, they observed a white male come from a gangway just east of 5500 Chippewa and walk up to a black male standing in front of the address. The officers observed what appeared to be a hand-to-hand transaction between the two individuals which Monasco believed, based on his experience, to be consistent with actions involving the purchase and sale of narcotics.

In order to further investigate this suspicious activity, Monasco and the other officers pulled to the curb in front of 5500 Chippewa. As they got out of their police cars and started to approach the two people in front of the address, the white male ran to the east and down the gangway, and was chased by two of the officers. While these officers chased this individual, Monasco and the second officer approached the black male (who was identified as the Defendant), who, at that time, was walking away from them toward the front door of 5500 Chippewa. Monasco asked the Defendant if he could talk to him, and the Defendant turned around facing the officer but continued to walk backwards away from the officers. As the Defendant reached the area of the porch of the premises, Monasco observed the Defendant drop a plastic baggie, which he had been concealing behind his leg, from his hand to the ground. The Defendant then walked back toward the officers, and said, "I don't know why that guy ran."

Monasco walked past the Defendant and saw that the plastic bag, which the Defendant had dropped, contained two off-white chunks which Monasco believed to be crack cocaine. As Monasco picked up the baggie, the Defendant said, "You didn't see me drop that." This statement was volunteered by the Defendant and was not made in response to any questions of the Defendant by anyone.

After picking up the plastic baggie containing the suspected cocaine, Monasco arrested the Defendant and fully advised the Defendant of his rights by reading his rights to him from a police department Miranda card. Monasco asked the Defendant if he understood his rights, and he stated he understood them. Monasco then searched the Defendant pursuant to his arrest, discovering a wadded up ten dollar bill in the Defendant's pocket and an ankle electronic monitoring device from the Department of Corrections attached to the Defendant's ankle. At this point, the Defendant said to Monasco words to the effect of please don't arrest me, I'm on paper and I've got a kid. This again was brought up by the Defendant and was not pursuant to any questions asked of him.

After the search of the Defendant's person, Monasco asked the Defendant where he lived, and the Defendant stated he lived at 5500 Chippewa, Apartment 1-East. Monasco then asked if there was any contraband or drugs in the apartment, and the Defendant told Monasco that he did have drugs in his closet. He also asked Monasco, "If I cooperate with you will you help me and my girlfriend?" The subject of cooperation was brought up by the Defendant, and Monasco told him that he could not promise him anything. Monasco then asked the Defendant if it was okay to search the apartment, and the Defendant said it was fine with him if it was okay with his girlfriend, "Kay." The officers determined that the Defendant's girlfriend was Koula Messalas, and the Defendant was living with Messalas at 5500 Chippewa, Apartment 1-East. They approached the apartment, and met

3

Messalas who was inside of the apartment on the front porch of the building. They determined from talking to Messalas that she shared the apartment with the Defendant and lived there with the Defendant and their small child. The record in the case shows that Messalas slept in the same bedroom as the Defendant, and had access to all areas of the apartment. While Messalas was on the front porch, they asked Messalas if they could search the house, and she said it was fine with her if they searched the house. They then provided her with a written consent to search form which they read and explained to her. She stated that she understood the form and signed the form consenting to a search of the apartment. The form reads in pertinent part as follows:

> I, Koula Messalas, hereby grant consent to Sgt. Michael Marks and PO Nick Monasco, Officers of the St. Louis Metropolitan Police Department to search the following apartment/house located at 5500 Chippewa, 1-E, St. Louis, Missouri, 63109. I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

After having the form read to her, Messalas signed the written consent to search form.

After Messalas signed the consent to search form, the officers went back outside of the house and produced a separate consent to search form which they read to the Defendant. The Defendant, at this point, was removed from the police vehicle where he had been placed when arrested, and the form was explained to him and read to him. It read exactly the same as the form signed by Koula Messalas, and the Defendant signed the form after it was read to him granting permission to search the premises. The police records show that the Defendant was arrested at about 10:30 p.m. on March 26, 2007, that Messalas signed the consent to search form at 10:38 p.m., and that the Defendant signed the consent to search form at 10:45 p.m. After the consent to search form was signed, the

4

Defendant was placed back in the car, and the officers proceeded to search the premises with Koula Messalas present in the house during the search.

During the search, the officers observed and seized in a closet in a bedroom of the house, shared by Messalas and the Defendant, a shoe box which contained a loaded .25 caliber pistol, extra ammunition for the pistol, and twelve individually packaged packets of what appeared to be crack cocaine. In the kitchen of the premises, the officers located a Laclede Gas bill addressed to Messalas at 5500 Chippewa, and a letter from the Board of Probation and Parole addressed to the Defendant at 5500 Chippewa.

After the guns and drugs were found in the premises, Monasco approached the Defendant and told him of the additional charges. In response to this, the Defendant stated, "I'll give you a big drug dealer if you help me out." The Defendant also repeated this statement at the South Patrol Division station after the officer told him that he would be charged with being a felon in possession of a firearm. During this entire time, the Defendant was not threatened in any manner nor was he promised anything even if he decided to cooperate with the officers.

It also should be noted that the Defendant and his friend Donald Norris testified at the hearing on this matter. Norris is the fiancé of the sister of Koula Messalas, who lives with and is the mother of the Defendant's children. On March 26, 2007, the Defendant called Norris and asked him to bring him a pack of cigarettes because he was on house arrest and could not leave the area of his apartment. Norris purchased the cigarettes and also apparently purchased several twenty-four ounce cans of beer, and then went to the Defendant's house, arriving, according to his testimony, between 4:30 and 5:30 p.m. After arriving at the house, Norris sat in front of the Defendant's next door neighbor's apartment with the neighbor and sometimes with the Defendant, smoking cigarettes, drinking beer,

5

and "hanging out." Norris said that at about 6:30 or 7 p.m. "about when it was getting dark," the police drove to the front of 5500 Chippewa and parked their police vehicles. The police then got out of their cars and approached a white male who had been in the area of the gangway east of 5500 Chippewa, and talked briefly to this white male. Norris said that the police then observed the Defendant on his porch, and ran up to him, pushing him back into the common area of his apartment building, and arresting him. Norris said that the police officers immediately handcuffed him and took him to their police car, placing him in the back seat of the car. Norris claimed that the Defendant never had contact with the white male in the gangway area, that he never saw the Defendant drop anything, and that the officers never asked the Defendant for consent to search his house. He said he did not personally talk to the police officers.

The Defendant testified that he was standing outside his residence on the front porch at about 10:30 p.m. when he observed police officers running toward him. They came directly up to him, pushed him back into his house, and arrested and handcuffed him. They then took him directly to their police car and placed him in the back seat. The police did not tell him why they had arrested him, and only told him that they would talk to him later. He did not know the police officers, and had never seen them before in his life. He stated that he did not sign the consent form, it had never been shown to him, and the signature on the consent form was forged. He testified that he was never asked for consent to search the premises. He stated that he did not drop anything as the officers approached him. He further said that the officers talked to his girlfriend Koula Messalas on the front porch of the apartment building after he was placed in the police car. He identified Koula Messalas's signature on the consent to search form, and said that the signature was her signature. He further stated that she lived in the apartment with him, and had access to all areas of the apartment.

6

The Defendant also hired a handwriting expert who testified at the hearing that the evidence presented to him was insufficient to conclude that the Defendant's signature was forged to the consent to search form. In essence, the expert testified that based on the evidence supplied to him, he could not conclude that the Defendant did write his own signature on the consent form or that he did not write his signature on the consent form.

As to the credibility of the witnesses, the undersigned notes that the Defendant has several felony convictions including a conviction for possession or trafficking in narcotics, and unlawful use of a weapon. In addition, the Defendant was under the supervision of the Board of Probation and Parole at the time of this offense, and, in fact, was on house arrest at 5500 Chippewa at the time this offense was allegedly committed at 5500 Chippewa. Therefore, the undersigned concludes that the Defendant has a strong personal interest in the outcome of this motion, having previously been convicted of multiple felony crimes. Further, the undersigned notes that the Defendant's friend Donald Norris also has a personal interest in the outcome of this trial. Although the police officers also have an interest in the outcome of the hearing, it is a professional interest and not a personal interest, and, in this regard, the undersigned notes the evidence shows that the police officers had no previous contact with the Defendant and did not even know his name before his arrest on the instant charges.

Specifically as to Norris's credibility, Norris testified on at least three separate occasions at the hearing that the Defendant was arrested by the police between 6:30 and 7:00 p.m., or "about the time it was getting dark." Norris also testified that although he was not inebriated, he had been drinking beer and smoking cigarettes for some time before the police arrival. The independent evidence at the hearing, including the testimony of the Defendant, the police officers, and the police

records in this matter, show that the Defendant was arrested at 10:30 p.m. at least some three hours after Norris says that he was arrested and definitely not "about when it was getting dark."

In addition, although the Defendant claims his name was forged on the consent to search form, it is uncontroverted even by the Defendant that Messalas had access to all areas of the apartment, and that she signed the consent to search the apartment at about 10:38 p.m., which was prior to the search being conducted. Thus, the undersigned concludes there is no logical reason for the police officers to forge the Defendant's signature to the form or to lie about the Defendant signing the form because the police officers already had an independently obtained consent to search form signed by Koula Messalas, and the Defendant admits he never objected to the search.

The undersigned also observed the demeanor of the witnesses in this case. Officer Monasco answered questions asked of him both on direct and cross-examination in a straightforward manner. His testimony was consistent with his written police report and the consent to search documents in the case. The undersigned concludes based on the court's observation and the above facts that Monasco was a very credible witness. Therefore, based on the demeanor of the witnesses as observed by the undersigned, the context of the testimony of the witnesses, the interest of the parties in the case, a conviction of one witness for criminal activity, and a major discrepancy in the testimony of one of the witnesses as to when the search took place, the undersigned accepts the testimony of Officer Monasco in its entirety, and rejects that portion of the Defendant's testimony and Norris's testimony which conflicts with Monasco's.

**Conclusions of Law**

A. The Seizure of Cocaine in Front of 5500 Chippewa and the Arrest of the Defendant

Based on the above findings, the undersigned concludes that the seizure of the two rocks of crack cocaine dropped by the Defendant and the arrest of the Defendant were lawful. Initially, the undersigned concludes that the seizure of the rocks of crack cocaine from the yard area of 5500 Chippewa was lawful. Lawful searches and seizures of abandoned property do not violate the Fourth Amendment. By voluntarily abandoning property, an individual forfeits any reasonable expectation of privacy in that property regardless of whether he retains some type of property interest in it. See Abel v. United States, 362 U.S. 217 (1960). In the case now at bar, as the officers were approaching the Defendant and asking to talk to him, he dropped a baggie of cocaine in the yard, and walked forward away from the cocaine toward the officers. The Defendant was not in custody at the time he dropped or abandoned the baggie containing the crack cocaine, and had not been detained. The officers only asked if they could speak to him, and they did not demand that he stop. Under these circumstances, the officer was justified in concluding that the Defendant had abandoned the crack cocaine. See also United States v. Hodari D, 499 U.S. 621 (1991). In addition, at that point, the crack cocaine was in plain view of the officer and in a location where he was lawfully present. See Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). Therefore, the undersigned concludes that the seizure of the crack cocaine was lawful.

In addition, police officers may arrest a person without a warrant if they have probable cause to believe the person arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964). Probable cause is a "fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal

rules." See Illinois v. Gates, 462 U.S. 213, 232 (1983). In the context of a warrantless arrest, all that need be shown is a "fair probability" that a crime has been committed and that the Defendant committed the crime. See Illinois v. Gates, supra. Based on the above, the undersigned concludes that there was ample if not overwhelming probable cause to arrest the Defendant. The officer observed the Defendant drop crack cocaine from his hand, and thus, the officer was an eyewitness to a felony crime being committed by the Defendant. Therefore, the undersigned concludes that there was ample probable cause to arrest the Defendant. Once a defendant is arrested, he may be searched incident to that arrest, and any items of evidentiary value may be seized from his person. See New York v. Belton, 453 U.S. 454 (1981). Based on the above, the undersigned concludes that the search of the Defendant's person incident to his arrest and the seizure of the ten dollar wadded up bill and the discovery of the electronic monitoring device were lawful.

### B. The Search of the Apartment

The undersigned further concludes based on the above findings that the search of 5500 Chippewa, Apartment 1-East, was lawful and based on consent to search given by both Koula Messalas and the Defendant. Police officers may search a premises if they obtain consent to do so from someone who has adequate authority over the premises. Consent is voluntary if it is the product of free choice and is not given under coercion or duress. Voluntariness is a fact question to be determined from the totality of the circumstances present. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1974). Among the factors to be considered in determining whether consent is voluntary include the following: whether or not the Defendant was aware that he may refuse to consent; the length of time a person is detained and questioned; whether the person was threatened, physically intimidated or punished; whether the Defendant relied on

promises or representations made by the police; whether consent occurred in public or in a secluded location; whether the Defendant objected to the search or passively looked on.  United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990).

Applying the above law to the present case, the undersigned concludes that the consent was voluntarily given.  The Defendant was not threatened, coerced, or intimidated by the police; the police made no promises to the Defendant to obtain his consent; consent was given by the Defendant while he was standing on the outside of the police car in front of his apartment house; the Defendant did not object to any aspect of the search; the Defendant was aware that he could refuse to consent to search; and the Defendant had been detained for only about fifteen minutes before he consented to the search.  Therefore, based on the above, the undersigned concludes that the Defendant voluntarily consented to all aspects of the search of his premises.

The same facts also apply to the consent signed by Koula Messalas as Messalas was not in custody at the time consent was given, and she was standing on the front porch of her house.  She likewise was not threatened in any way or promised anything, and she was informed of her right to refuse to consent before granting consent.  Therefore, the undersigned concludes that her consent was voluntarily given.[1]

---

[1] The Defendant cites Georgia v. Randolph, 547 U.S. 103 (2006) as applicable law for jointly occupied premises.  In the case now at bar, however, it is undisputed that the Defendant never refused to consent to the search or objected to the search.  Thus, the undersigned concludes that Illinois v. Rodriguez, 497 U.S. 177 (1990), and United States v. Matlock, 415 U.S. 164 (1974) are controlling.  The undersigned also concludes that based on the credible evidence both co-tenants consented in writing to the search.

### C. Statements Made by the Defendant to Officer Monasco

Based on the above findings, the undersigned concludes that the Defendant's statements to Officer Monasco were voluntarily made by the Defendant, and were either voluntarily made volunteered statements under Rhode Island v. Innis, or were made after the Defendant was advised of his full Miranda rights.

Regarding the statements to the officers that he did not know why the individual ran away and that they did not see him drop anything, these statements were made before the Defendant was placed in custody and did not come in response to any questions asked of the Defendant. Therefore, they are voluntarily made volunteered statements and should not be suppressed. See Rhode Island v. Innis, 446 U.S. 291 (1980).

With regard to all other statements made by the Defendant, they came after the Defendant was fully advised of his rights by reading him his full Miranda rights and waiving those rights by stating that he understood them and talking to the officers. No threats or promises were made to the Defendant to obtain any statements from him. Therefore, based on the above, the undersigned concludes that the Defendant's statements were voluntarily made after being advised of his full Miranda rights, and should not be suppressed. See Miranda v. Arizona, 384 U.S. 436 (1966); North Carolina v. Butler, 441 U.S. 369 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); United States v. House, 939 F.2d 659 (8th Cir. 1991).

**Conclusion**

Therefore, the Defendant's motion to suppress should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion of Defendant to Suppress Evidence and Statements [Doc. #18] be **denied**.

Further, the parties are advised that they have until January 18, 2008, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Finally, the trial of this matter is set on **February 11, 2008,** at **9 a.m.** before the Honorable Jean C. Hamilton, United States District Judge, Courtroom 16-North.

       /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  7th  day of January, 2008.